EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                :
UNITED STATES OF AMERICA,       :        Criminal Action
                                :
             Plaintiff,         :        No.  2:13-cr-00218
                                :
v.                              :
                                :        Date:  January 21, 2014
HAROLD BROWN, II,               :
                                :
             Defendant.         :
_____x
```

TRANSCRIPT OF SENTENCING HEARING HELD
BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:          AUSA THOMAS C. RYAN
                             U.S. Attorney's Office
                             P.O. Box 1713
                             Charleston, WV  25326-1713

For the Defendant:           TIM C. CARRICO, ESQ.
                             Carrico Law Offices
                             1412 Kanawha Boulevard, East
                             Charleston, WV 25301

Probation Officer:           Matthew Lambert

Court Reporter:              Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1    PROCEEDINGS had before The Honorable Thomas E. Johnston,

2  Judge, United States District Court, Southern District of West

3  Virginia, in Charleston, West Virginia, on January 21, 2014, at

4  11:19 a.m., as follows:

5    COURTROOM DEPUTY CLERK:  The matter before the Court is

6  the United States v. Harold Brown, II, criminal action number

7  2:13-cr-00218, scheduled for sentencing.

8    THE COURT:  Good morning.  Will counsel please note

9  their appearances?

10    MR. RYAN:  Good morning, Your Honor.  Thomas C. Ryan on

11  behalf of the United States.

12    MR. CARRICO:  Tim Carrico on behalf of Harold Wayne

13  Brown, II, who is present in person.

14    THE COURT:  Good morning.

15    Mr. Brown, will you please stand, and I will ask the deputy

16  clerk to administer an oath to you at this time.

17    COURTROOM DEPUTY CLERK:  Please raise your right hand.

18    **HAROLD BROWN, II, DEFENDANT, SWORN**

19    THE COURT:  You may be seated.

20    Mr. Brown, do you understand that you are now under oath and

21  you must tell the truth and, if you testify falsely, you may face

22  prosecution for perjury or for making a false statement?

23    THE DEFENDANT:  Yes, sir.

24    THE COURT:  Throughout the course of this hearing, if

25  there's anything that occurs that you don't understand, I want

1    you to feel free to speak up and seek clarification.

2         Also, if at any time you need to confer with your attorney,

3    I'll be pleased to pause the proceedings to allow you to do so.

4         Do you understand that?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  All right.  Let me begin with the factual

7    basis.  I believe I deferred that at the plea hearing.  As I

8    reviewed this, I realized that I'd like to -- we agree that

9    materiality is an element of this offense, correct?

10             MR. RYAN:  Yes, Your Honor.

11             MR. CARRICO:  Yes, sir.

12             THE COURT:  All right.  It's not abundantly clear to me

13   how materiality is satisfied, so I would like to hear from the

14   parties on that.  I think it probably is, but I don't think it's

15   been spelled out, and so I'd like to hear from the parties on

16   that.

17             MR. RYAN:  Your Honor, in the government's view, the

18   false statement provided by Mr. Brown was immaterial for several

19   reasons.  First off, in August of 2012, I believe, he was

20   interviewed initially by Special Agent Payette from the West

21   Virginia State Police at the Danville detachment.  He provided

22   specific information about a transaction with Mr. Steele

23   indicating that he had gotten $5,000.00, but, in fact, it was a

24   loan.  Therefore, it was no gift, no gratuity, he wasn't involved

25   in the scheme, and had nothing to do with it.

1    We proceeded on in the investigation and, at some point, he

2  retained counsel.  We brought him into the United States

3  Attorney's Office, where he again met with Special Agent Payette

4  and myself on behalf of the government, and provided the same

5  information through a proffer session in which he reiterated that

6  the $5,000.00 was simply a loan.  Therefore, he did not receive,

7  in his view, anything of gratuity or benefit from this particular

8  wire fraud scheme which, at that point, within the Massey Legacy

9  Mines along Route 3, now owned by Alpha, our investigation was

10  well known.

11    The government was looking to put a case together and move

12  forward on M&S Hydraulics and Mr. Steele.  We had the information

13  we were gathering up from Mr. Mullins, and Mr. Phalin, and Mr.

14  Coleman, but they were all at the sourcing agent level.

15    Mr. Brown was -- excuse me -- was within the hierarchy of

16  the operation of the underground mine, the underground

17  maintenance chief, commonly referred to as "Chief Electrician",

18  which was the next step in the supervisory hierarchy on site at

19  the underground mine.  We needed and were looking for cooperation

20  from someone at that level and we had approached Mr. Brown in

21  that regard; but, frankly, he lied about that material aspect,

22  the fact that he had received the $5,000.00 as a loan and had, in

23  fact, re-paid that amount in small increments.

24    Because we did not have his cooperation and he had provided

25  a false statement, instead of executing a search warrant on M&S

1    Hydraulics in August of 2012, had he been truthful, it took the

2    government another six months to work up a sufficient enough case

3    to establish probable cause, to be prepared to move forcefully on

4    Mr. Steele and M&S Hydraulics, and secure his cooperation.

5         Had Mr. Brown provided information truthfully when asked

6    twice by law enforcement back in August of 2012, the case would

7    have moved at least at that much faster of a rate, and the

8    opportunity to prosecute other individuals would have been

9    greater if we could have secured his truthful cooperation

10   earlier.

11        And, as discussed during Mr. Steele's sentencing, we did, in

12   fact, secure his cooperation, albeit later, as a result of Mr.

13   Brown's conduct, but he quickly dispelled the veracity of Mr.

14   Brown's statements regarding the nature of the $5,000.00 and, in

15   fact, whether any of that had been re-paid.

16        We were able to judge the credibility and evaluate the

17   statements made by Mr. Steele and determine with sufficient

18   belief that Mr. Brown had, in fact, lied and we went back and

19   confronted him through his attorney and he did, in fact, admit

20   that he lied on that point, which we believe is material, and it

21   was material because it delayed our investigation by at least six

22   months.  It also is material in the fact that it demonstrated

23   that this scheme did not involve simply these sourcing agents in

24   any rogue fashion, but rather, the involvement of an underground

25   maintenance chief demonstrated, at least to us, in some respects,

the systemic nature of this scheme, how a number of individuals profited and participated on different levels within the corporation.

     For those reasons, the United States believes that the element of materiality would be satisfied for prosecution under 18 U. S. C. 1001.

          THE COURT:  And, just so we're clear, Steele was not cooperating when this defendant made this false statement?

          MR. RYAN:  That's correct, Your Honor.

          THE COURT:  That didn't happen until after the search warrant?

          MR. RYAN:  Yes, Your Honor.  That -- Mr. Steele did not cooperate until after the search warrant in February of 2013.

          THE COURT:  All right.  Very well.

     And, Mr. Carrico, do you accept that as a proffer?

          MR. CARRICO:  Yes, sir, I do.  Thank you.

          THE COURT:  Do you have anything to add to that?

          MR. CARRICO:  No, sir.  I believe that the facts, as set forth by Mr. Ryan, are accurate and was my understanding as to what transpired.

          THE COURT:  Okay.  Well, I appreciate that.  I searched the record in vein for that kind of information.  There were hints of it, but that was about it, so I think it was necessary for me to make a record on that point today.

     I would add to the Fourth Circuit standard for materiality

with regard to a charge under 1001 is set forth in the case of
*United States v. Garcia-Ochoa*, 607 F.3d 371, a Fourth Circuit
case from 2010, in which the Fourth Circuit states that --
acknowledges that materiality is an essential element of the
offense under that statute, 1001, and beyond that, that the test
of materiality is whether the false statement has a natural
tendency to influence agency action, or is capable of influencing
agency action.

Based on that standard and the representations of the
government today, I have no trouble finding that the element of
materiality is met, and I will find that there is a factual basis
for this offense, as the defendant has pled guilty to.

All right. Mr. Carrico, have you received, and read, and
reviewed with your client a copy of the Presentence Report?

MR. CARRICO: Yes, sir, I have.

THE COURT: And, Mr. Brown, have you received, and
read, and reviewed with your counsel a copy of the Presentence
Report?

THE DEFENDANT: Yes, sir.

THE COURT: Has the government received and reviewed a
copy of the Presentence Report?

MR. RYAN: Yes, Your Honor.

THE COURT: All right. As I understand it, there are
two outstanding issues. Now, one of them is restitution. Mr.
Ryan has provided to me, to my law clerk, a copy of an opinion

from the Fourth Circuit on -- that was issued on Friday.

Mr. Carrico, have you seen that?

MR. CARRICO:  Yes, sir, I have.

THE COURT:  I haven't had a chance to read the whole opinion, but the first page or so sort of tells a story, and it doesn't seem to be helpful to the government's position.

Would you agree with that, Mr. Ryan?

MR. RYAN:  I would concur, Your Honor.

THE COURT:  All right.  Well, here's my perspective on the restitution in this case.  This defendant pled guilty to the false statement and I have a hard time then attributing the entire restitution of the fraud scheme.  That was my gut reaction.  I would have a hard time attributing the entire restitution of the fraud scheme to this defendant, that being the $1.3 million dollars or so, anyway, and I think that the case -- Friday's case, the *Freeman* case, validates that concern.  Beyond that, that amount has already been paid in full by Mr. Steele. So, to that extent, it is moot.

Further, I don't think it makes a bit of sense to order that this defendant pay $5,000.00 in restitution to Mr. Steele.  That doesn't -- I don't perceive Mr. Steele as a victim in this case. So, therefore, I find that restitution does not apply in this case based on those findings.

Is there any objection to that?

MR. RYAN:  No, Your Honor.

1    MR. CARRICO:  No, Your Honor.

2    THE COURT:  All right.  Very well.

3    That does not eliminate the possibility of other financial

4    penalties, but I will find that restitution does not apply.

5    Now, let's talk about this guideline calculation, which is

6    sort of mind boggling.  It seems to me that, having gone through

7    the guidelines, and I meant to bring my Guideline Book out here.

8    Do you have that handy, John?

9    It all boils down, this whole issue, everybody agrees that

10   you start out at 2B1.1.  Then you go to -- I just want to make

11   sure I have this right for the record.

12   That sends you on a cross reference to 2J1.2, which then

13   sends you on cross reference to 2X3.1, which in turn sends you

14   back on a cross reference to where you started, at 2B1.1.  That

15   is -- that is legal drafting worthy of Congress.

16   The -- and then, when you get back to 2B1.1, this whole

17   issue boils to 2B1.1(a)(1) and whether or not Subsection 1 or 2

18   applies with a base offense level of either 7 or 6.  7 applies if

19   -- if, A., the defendant was convicted of an offense referenced

20   to this guideline, which because of -- that's where the starting

21   point is, so that's fulfilled, and that that offense of

22   conviction has a statutory maximum term of imprisonment of

23   20 years or more.

24   Now, this defendant's offense of conviction is not 20 years

25   or more, but we arrive at 2B1.1 by borrowing from the guideline

1 calculation for the underlying offense, which arguably is the

2 wire fraud, which does have a maximum term of imprisonment of

3 20 years or more.  That's the issue, am I correct?

4      MR. RYAN:  Your Honor has succinctly teed up the issue

5 and, if I may, recognizing this is the government's burden, and

6 the government has not identified any common law precedent on

7 this issue and, frankly, recognizes this as a convoluted

8 guideline calculation, as the Court's properly noted, the reason

9 that the government believes that the subsection that

10 incorporates the wire fraud scheme, being the seven-point base

11 offense level, is derived under the cross reference that comes

12 out of 2J1.2, which counsels the Court to cross reference to

13 accessory after the fact, which brings us back to the wire fraud

14 of 2B1.1.

15     The language in that particular statute, in that particular

16 cross reference, which I'm reading literally, "If the offense

17 involved obstruction -- obstructing an investigation or

18 prosecution of a criminal offense, apply accessory after the fact

19 in respect to that criminal offense."  So the government reads

20 that criminal offense to be the wire fraud scheme, which would

21 incorporate the seven-point base offense level.  Moving through

22 towards accessory after the fact, six levels is reduced pursuant

23 to 2X3.1.

24     To calculate this guideline using the loss amount from the

25 wire fraud scheme, but the base offense level from the false

statement seems to me to be an incongruent result, it's either going to be the wire fraud offense level or it's going to be the 1001 offense level. It doesn't seem to me to satisfy the cross reference to only take part of the adjusted offense level for the underlying criminal offense.

I concur, and the government -- or, excuse me, the Court's arrival at the issue through the guidelines and the double cross reference, and I agree that that -- the issue is whether or not the base offense level is 7 or 6, and that question in my mind is answered by 2J1.2, which counsels the Court to use the guideline for the underlying criminal offense, that being the wire fraud scheme.

THE COURT: Let me ask you one question about all of that, and that goes back to the Application Note 1 of 2X3.1. At the bottom of that paragraph, it says, "Apply the base offense level, plus any applicable specific offense characteristics that were known, or reasonably should have been known, to the defendant." Should that give me pause in terms of whether or not he knew the extent of the relevant conduct in the wire fraud?

MR. RYAN: No, Your Honor. I think the relevant conduct issue is answered by the plea agreement itself captured by at least the parties' agreement on the relevant conduct issue for guideline purposes. So I think the Court can rest upon the parties' agreement in that regard.

I -- looking again, I did try to analyze this Application

1    Note, and it speaks to me that the defendant would be responsible

2    for the underlying offense and all of the attributable specific

3    offense characteristics, simply the relevant conduct analysis

4    and, per the parties' agreement, he agrees that the loss amount

5    that was known to the government and provable at the time of his

6    plea agreement was $1.3 million.  So I believe the Court can rest

7    upon the parties' agreement by that amount.

8          THE COURT:  Mr. Carrico, what say you?  You agreed to

9    the higher level.

10         MR. CARRICO:  Your Honor, we've signed the plea

11    agreement.  We've stipulated to what the offense level would be

12    and the amount.  I don't think I can argue differently here.

13    Technically, that would be in violation of the plea agreement.

14         THE COURT:  Well, this is a -- I think, on the issue of

15    the underlying offense, there isn't a whole lot of authority.  I

16    would cite one case, which while it doesn't analyze it, it does

17    apply it the same way in almost identical circumstance, and

18    that's *U. S. v. Alatrash,* 460 Fed. App. 487, a Sixth Circuit

19    case, unpublished Sixth Circuit case from 2012 and, in that case,

20    the Court applied -- I think it was actually mail fraud in that

21    case, too.  The Court applied the guidelines in such a way that

22    it went back to 2B1.1 and applied the mail fraud even for -- that

23    particular defendant was charged with the false representations

24    crime.

25       The -- and I think that is -- in general, that is consistent

1   with the Fourth Circuit's policy of punishing more severely those

2   who are accessories after the fact of more serious crimes, and

3   that is spelled out -- that policy is spelled out in *U. S. v.*

4   *Godwin*, 253 F.3d 784, a Fourth Circuit case from 2001.

5       Now, whether or not -- so I think that -- and I think that's

6   -- this -- there are a lot of parts to this analysis and there's

7   a lot of ways this could go in a lot of different directions, and

8   I don't fault the probation officer at all for his interpretation

9   of this guideline because this guideline is difficult to

10  interpret, but having had the opportunity to analyze it, I

11  believe the government is correct when it refers to the

12  underlying offense of conviction.  At that point, it is borrowing

13  from a different crime and so, in that case, the -- and, with

14  wire fraud, the statutory maximum is 20 years.  So I am going to

15  sustain the government's objection, at least on that point.

16      Now, when I read the Application Note that talked about

17  applying the offense level, plus any applicable specific offense

18  characteristic which, in this case, would be the dollar amounts

19  that were known, or reasonably should have been known by the

20  defendant, I don't know.  That's something I haven't had a chance

21  to look at.  Nobody has really raised that issue.

22      In all honesty, I don't -- I really don't know how to

23  analyze that, at this point, but other than, of course, we know

24  that this defendant was aware that this scheme was going on.

25  Whether or not he had to be -- for that to apply, whether or not

1   he had to know -- have some sense of the extent of it, I have

2   some sense of the extent of it, at this point, and it seems like

3   a lot of this was going on, but I guess, for me, I'm inclined to

4   go ahead and apply this guideline, also knowing that -- and I'll

5   get into this in more detail later -- that I am very likely to

6   vary in this case anyway.  So that's -- I think I'm going to go

7   ahead and sustain the government's objection, which is also

8   consistent with the defendant's agreement in the plea agreement.

9       All right.  I believe that resolves all of the objections,

10  am I correct?

11              MR. RYAN:  Yes, Your Honor.

12              MR. CARRICO:  Yes, sir.

13              THE COURT:  All right.  Therefore, I will direct the

14  probation officer to prepare an addendum to the Presentence

15  Report reflecting my rulings and, otherwise, I will -- as

16  amended, I will adopt the Presentence Report, as written.

17      I would note that I have received, in four batches, I think,

18  a total of 12 letters on behalf of the defendant.  Mr. Ryan, you

19  appear to have been copied on all of those letters.  Have you

20  received them all?

21              MR. RYAN:  I have, Your Honor

22              THE COURT:  All right.  Mr. Carrico, would you like

23  those to be made a part of the record for this proceeding?

24              MR. CARRICO:  Yes, sir, I would.

25              THE COURT:  Is there any objection?

1           MR. RYAN:  No, Your Honor.

2           THE COURT:  All right.  That will be so ordered.

3      On September 25th, 2013, the defendant appeared before this

4  Court and entered a plea of guilty to a single-count information

5  charging him with making a false statement in violation of 18 U.

6  S. C. 1001(a)(2).

7      I will now adjudge the defendant guilty of that crime and

8  accept the plea agreement that was previously filed.

9      I am now ready to give my tentative findings as to the

10  applicable guidelines.  Of course, there is a base offense level

11  in 2J1.2, but with the various cross-references, that leads us

12  back to a base offense level of 7 under 2B1.1; plus 16 for the

13  specific offense characteristics amount; minus 6 for the

14  accessory after the fact reduction under 2X3.1, which leads to an

15  adjusted offense level of 17; minus -- well, let me ask you, is

16  the government moving for the third level for acceptance of

17  responsibility?

18           MR. RYAN:  The government so moves.

19           THE COURT:  That motion will be granted.

20      Therefore, I find an additional three-level reduction for

21  acceptance of responsibility, for a total offense level of 14; a

22  criminal history category of I based on 0 criminal history

23  points, yielding an imprisonment range of 15 to 21 months; 1 to

24  3 years of supervised release; a fine range of $4,000.00 to

25  $40,000.00; and a mandatory special assessment of $100.00, which

1    I note has already been paid.

2    Are there any legal objections to my tentative findings as

3    to the applicable guidelines?

4    MR. RYAN:  No, Your Honor.

5    MR. CARRICO:  No, sir.

6    THE COURT:  All right.  I believe I would be correct in

7    finding in this case that there is legally no victim in this

8    case, am I correct, Mr. Ryan?

9    MR. RYAN:  In light of the United States' -- *United*

10    *States v. Freeman*, I believe the Court is correct in that regard.

11    THE COURT:  All right.  Very well.  Well, just for the

12    record, though, has -- to the extent that, at one time, Alpha

13    might have been considered a victim in this case, have they

14    received all rights and notifications required under the various

15    victims rights statutes and regulations?

16    MR. RYAN:  Yes, Your Honor.  For practical purposes,

17    the government has treated Alpha Natural Resources as a victim in

18    this case and afforded all of those notices.

19    THE COURT:  And does Alpha wish to address the Court

20    today?

21    MR. RYAN:  No, Your Honor.

22    THE COURT:  All right.  Very well.

23    Mr. Brown, at this time, the Federal Rules of Criminal

24    Procedure give you that right to make any statement that you

25    would like to make, although you're not obligated to make any

```
1    statement.  However, if you do choose to make a statement, I
2    would ask that you stand to do so.
3              THE DEFENDANT:  I want to say is I'm very sorry for
4    what I done.  I have embarrassed myself, my family.  I've put my
5    family in harm's way financially.  As you can see, I have a lot
6    of family and friends that are here to support me.
7         And I want to say, Mr. Ryan and Ms. Payette, I'm sorry for
8    what I done.  It was wrong, I know it was wrong, and I know
9    better, but to have something taken away from you that you've had
10   all your life is tragic, and to have the stuff taken away from
11   financially to me, the right to vote, and the right to hunt,
12   kills me.
13        So I want to thank my family and friends for coming and
14   supporting me behind this whole time and I want to say I'm really
15   sorry.  Thank you.
16             THE COURT:  Thank you, sir.
17        Mr. Carrico?
18             MR. CARRICO:  Just briefly on Mr. Brown's behalf, Your
19   Honor.  As the Court is aware, I filed a sentencing memoranda
20   asking the Court to consider a variant sentence.  It is my
21   understanding his guideline range, his advisory guideline range,
22   is 15 to 21 months.  I believe that, based on the facts and
23   circumstances specific to him and the other defendants in this
24   case, that they warrant at least the Court's consideration of a
25   sentence of probation in this case.
```

First and foremost, like you see in much of these types of cases, it doesn't appear any of the defendants have any criminal history and, obviously, Mr. Brown is 41 years old, no prior criminal history whatsoever at all, and so he does not appear to be a threat or a danger to commit more crime.

Furthermore, his work history has been exemplary his entire life. I mean, he's always worked very hard and, notwithstanding even this, apparently, he's a good enough worker for Patriot -- and he's working for STRATA. I put that in the memoranda, which is an employee -- they provide contract labor at Patriot Coal Mine, and that's what he's doing now. So they're keeping him working so, obviously, he's done a good job. He's not making the kind of money he was making before, but he has a job working in the coal mines in Waverly, Kentucky. He's staying in Evansville overnight throughout the time he works. He comes back on weekends to see his family. He's got two young -- an 18-year-old boy and a 13-year-old little girl.

Since this happened, he went -- in the State of Kentucky, he got his underground mining license. He also got his electrical certification and, actually, the Court allowed him -- we filed a motion to continue the sentencing hearing to allow him to get his foreman certification, which he informed me that he did, in fact, receive. So, as to paying -- if the Court asks him to pay any fine, penalty, anything like that, it's going to -- he does have income to apply and, if the Court is inclined to leave him on

probation, or even as to home confinement as a term or condition, he plans to continue to work to provide for his family and to pay whatever costs are necessary to the government as a result of his conduct.

He has extensive family -- family and community support. I've read every one of the letters, submitted them to the Court. He clearly has a lot of people that he has touched in his life. I thought the letter from his son was very compelling.

Obviously, it's not a violent offense, but one of the factors I think is important in this case is the need to avoid unwarranted sentence disparities as to defendants who have committed similar misconduct. Now, in the PSR, these other defendants are identified that were involved in this.

First and foremost, I understand, and I believe the Court ordered probation as to three of the lower-level defendants, and two of them got home confinement and one of them received outright probation. I do understand each one of those defendants got 5K1.1 motions.

Now, importantly, each one of those defendants, I believe, if you look at the type of conduct and what they were prosecuted for, I know each statement is different, and he's prosecuted for giving a false statement. The other defendants were convicted of wire fraud, but under the legislature, they treat that apparently as a harsher, more serious crime in that the sentence is -- possible maximum sentence is much greater under 1343 at 20 years,

1    rather than five years for giving a false statement.  I think,

2    Your Honor, I think that's important.

3        I think the other defendants who received probation agreed

4    under their plea agreements that the loss to Alpha directly

5    attributable and proximately caused by their own conduct was

6    $194,000.00, each one of them, and I think we've determined, as

7    to his conduct, there is no readily identifiable victim.  The

8    victim probably is Mr. Steele, but it's $5,000.00, and so that

9    somewhat distinguishes what he did.

10       And I think it's important just because still, his sentence

11   under the guideline range, 15 to 21 months, is being driven by

12   the loss of this conspiracy and I think his actual conduct in

13   this whole thing, it didn't involve -- he wasn't approving

14   invoices, anything like that, he was just aware of it, and it

15   seems he took advantage of an opportunity, and now he's been

16   prosecuted for it.

17       I think, if you consider that, and you consider these other

18   sentences, I think that where he is, to vary down to a sentence

19   of probation in his case, is not a real far drop, especially when

20   you compare the conduct of the other defendants and him, but I

21   think -- I understand what he's being prosecuted for, which is

22   giving a false statement to a federal agent that was in

23   connection with this investigation.

24       I think that, on the ability to help himself out, I think he

25   could have -- if he would have told the truth originally, he

would have been able to help himself out.  The other defendants who got 5K1.1 motions, I'm not -- they were able to come in and I do understand, and I think that his unlawfulness would have occurred after all the loss, most of the loss actually occurred in the first place, and it was his -- the largest harm that he caused was what Mr. Ryan stated, was the six months.  They could have investigated this thing a lot faster, gotten a warrant earlier and done a search, had he provided truthful information.

So -- Your Honor, so based on -- based on all of those factors, comparing the other sentences as to the other defendants, we would respectfully request the Court to grant him probation and, if necessary, to allow him -- or home confinement, if the Court would deem that necessary as additional punishment.

Furthermore, what's not in the Presentence Investigation Report, I do understand that he's -- the guideline range for the sentence, recommended sentence, or a fine for defendant is $3,000.00 to $30,000.00, if I'm correct.

THE COURT:  That's $4,000.00 to $40,000.00.

MR. CARRICO:  Yeah, it went up.  So he -- what is not identified, he does have a retirement account through T. Rowe Price.  I have a year-ending statement for 2013 that shows a value of $58,270.86.  So he does have money available to pay any fine that the Court would deem appropriate.  His plan would be to liquidate this immediately and pay whatever fine.

Therefore, I'm asking the Court to consider giving him a

1    stiff fine, giving him probation.  He can pay -- he can pay the

2    fine immediately.  Thank you very much.

3          THE COURT:  Thank you, Mr. Carrico.

4       Mr. Ryan?

5          MR. RYAN:  Thank you, Your Honor.  I'd like to address

6    three issues related to this particular prosecution and

7    sentencing.  First, the nature of the offense, the nature of the

8    underlying conduct, and the deterrent value that's necessary in

9    this prosecution.

10      The nature of the offense, lying to a federal officer.  When

11   Mr. Brown was first interviewed about his involvement and, again,

12   this investigation, as the Court is aware, started in what we

13   call the Tire Fraud, or the Tire Investigation, and that's what

14   was the focus of these questions.

15      And, when Special Agent Payette initially interviewed this

16   defendant and said, "Well, have you gotten anything else from any

17   other vendor, other than a tire vendor?"  "Well, I got $5,000.00

18   from" -- and, as he was referred to at the time, "Big Daddy," Mr.

19   Steele, "but I paid that money back.  I paid that money back."

20   And she prepared a 302.  We continued the investigation.

21      We brought Mr. Brown into our office to interview him.

22   Again, we're focused on the tire fraud investigation, and he sat

23   across the table in the United States Attorney's Office from

24   myself and Special Agent Payette and, as we were asking the

25   questions about the tire fraud investigation, he blurted out

again this episode involving Mr. Steele and the $5,000.00 to help buy this Cadillac. It was really unprovoked.

And Special Agent Payette and I agreed before he had left the building that he was absolutely lying and, frankly, Mr. Brown is not a very good liar in that respect, because it was obvious that he knew it, but he knew that he was in trouble, he had given the story, he had given the story to his employer and what may have started as a desire to protect his job, and then he gave it to the state police, and the FBI at their interview in Danville, and then he gave it again in our office, knowing that it was absolutely false.

And, frankly, without eventually catching up with Mr. Steele and securing his cooperation and hearing his version of the events, we perhaps may never have been able to prove the falsity of Mr. Brown's statements.

This is a gentleman that had numerous opportunities, had retained counsel before he was even charged to correct and rectify his false statement, but he stuck by his story, and it became necessary, frankly, to prosecute him as a result of that.

The underlying conduct. Mr. Brown wanted to buy a car and he was on his way to the auction to pick up a Cadillac. This conduct is indicative of the scheme that permeated the mines that ran along Route 3.

He needed an extra five grand for the downpayment. He thought it okay and acceptable to call up Steele and say, "I need

five grand. Deposit it into my checking account. I'm going to buy a Cadillac." This is indicative, in the government's view, of just how widespread and accepted this scheme was.

This is an underground maintenance chief, which is viewed by many at the underground mine site as a supervisory role, along with the superintendant, in charge of keeping the mines operational of all of its electrical components, and he thought it okay just to call up a vendor and ask for five grand, and everybody knows that he wasn't asking, and everybody involved in the scheme knew that, ultimately, Steele wasn't going to pay for it, that it was going to come back and be billed through Alpha through some manner or means, but it's demonstrative, in our view, of just the -- how this scheme was executed, how it was accepted, and just, frankly, how wrong it is on so many levels to think that this is okay.

And finally, the deterrent value that's necessary and, really, the reason we decided it was necessary to pursue these charges, Mr. Brown was in a position, as an underground maintenance chief, that could say, this is wrong. I'm not going to be involved in this and, frankly, I'm not going to be around other employees that are involved in it.

He could have an audience with the appropriate supervisor above his level, above the underground mining level, as I understand it, to bring this to the attention of the appropriate administration within Alpha Natural Resources, but like so many

others similarly situated, he went along, and he participated, he benefited, and it is important in our mind that a prosecution involving a person in his position was necessary to hopefully demonstrate to other individuals, superintendents, bosses, foremen, underground maintenance chiefs, those that are entrusted with any authority in an underground mine level, to raise the red flag, to refuse to participate, and bring this to their employer's attention.  Thank you.

THE COURT:  Well, on that last point, we've talked about this before and, actually, I noticed that, in this Presentence Report, the first one of the seven that mentioned that there was a superintendent involved in -- actually involved in the wire fraud scheme, and all of that leads back to a question I had for you back, I think, in maybe Mr. Coleman's hearing, which was, I understand your position that in a perfect world, this defendant would have notified somebody higher up in Alpha that this was occurring.

However, given what everybody seems to agree is the pervasive nature of this and that people either knew about it, or were involved at levels even higher than Mr. Brown, what do you think his prospects for his career would be, from his perspective at that moment, of reporting this to somebody higher up at Alpha?

MR. RYAN:  Your Honor, that's a very good question, and it's a reality that all of these defendants had to deal with, but, frankly, going along to get along, particularly in a fraud

scheme, doesn't make it right.

There are -- there are, frankly, with the response that the government has seen from Alpha Natural Resources to the unveiling of this scheme and its willingness to commit financial and human resources to assisting the investigation, the opportunity for Mr. Brown to find the appropriate audience, at least within the government's view within Alpha Natural Resources, was there and he not only worked with and answered to a superintendent locally, but as I understand the management structure, he had avenues to reach the main corporate office, not necessarily through his superintendent.

It is, in fact, the reality of this type of scheme, and it is a reality that these gentlemen had to deal with every single day, but this is a defendant that not only let it go on, or go on around him, he actively participated.  He actively benefited.  He thought it was okay to call Mr. Steele up and ask for $5,000.00.

I think the Court's concern, which is rightfully placed, is something that can be taken into account for the appropriate sentence that's fashioned in this prosecution, but nonetheless, because others were involved, it simply, in the government's view, does not seem in any way to relieve this defendant of at least stopping from participating, if not reporting it.

THE COURT:  Well, I guess my final comment on all of this is that, going forward, it seems to me that it's incumbent upon Alpha, and other mining companies, if they -- it would seem

to me that they would have every incentive, from a

dollar-and-cents perspective alone, to create a corporate culture

in which this sort of thing is not tolerated and only --

ultimately, only they can do that, but I certainly have taken

this aspect of it into consideration in my sentencing decision

and I appreciate your comments, Mr. Ryan.

All right.  After consideration of the advisory guidelines

and the other applicable factors from 18 U. S. C. Section

3553(a), I am now ready to impose sentence.

Will the defendant please stand?

Mr. Brown, based on my knowledge of your case, you came in,

and I'm not saying that -- I understand you got some football

tickets and that sort of thing over the course of the years, but

you came in at the tail end of this scheme, a scheme involving

many lies, and the loss of millions in fraud and millions of

dollars, and you told one lie, which you repeated perhaps one

time.  That is not a crime to be taken lightly, but I do note

that it happened once, perhaps twice, the second time when you

met with Mr. Ryan, and it -- and that there is no evidence, other

than receiving this benefit of this fraud scheme, that you were

involved in the fraud itself.  You weren't, as I understand it,

involved in processing the paperwork and whatnot.

As I reflect on this case, and my understanding of this

case, it seems to me that in your particular case, the

application of the fraud guideline and relevant conduct aspect of

that guideline really doesn't reflect your particular conduct in this case. You were one of many people who received some benefits from Mr. Green -- or Steele -- and, yet, as I indicated, you weren't involved in the actual fraud, at least that I'm aware of.

I note that you have no criminal history, that you have had a very productive work life. You've had a very good career in the mining industry, by any standard, and that you appear to be a decent family man, otherwise.

And I can't ignore the fact that you now have what appears to be a pretty good job. I know that it's unfortunate that you are having to work out of town. Perhaps, at some point in the future, that will change, but it's pretty hard for me to see taking you away from a job like that through the sentencing process for this particular case.

I think that you are -- I find that you are very unlikely to re-offend. I believe that the felony conviction that you have suffered, and the financial ramifications for this case, and I don't doubt that losing the right to vote and, in particular, losing the right to own or possess a firearm and, therefore, hunt with firearms is a -- in the context in which you have lived and worked, is a significant deterrent to lying to federal agents, which is not a -- is not a thing to be taken lightly, but I know that it is something that you regret and these penalties, I think, do create a deterrent.

1    Finally, I note that almost all of the defendants in this

2    case have, for one reason or another, gotten some kind of

3    downward variance and so I think that it would create -- in

4    addition to all the reasons that I have indicated, I think it

5    would create unwarranted disparity for me to not do that in your

6    case, particularly given the way that your guidelines were

7    calculated.

8    Therefore, it is the judgment of the this Court that you be

9    sentenced to a term of five years of probation.

10   While on probation, you must not commit another federal,

11   state or local crime; you must not possess a firearm or other

12   dangerous weapon; and you must not unlawfully possess a

13   controlled substance.

14   You also must comply with the standard terms and conditions

15   of probation as recommended by the U. S. Sentencing Commission

16   and as adopted by this Court, including the -- except, because

17   there's no reason for it, you need not participate in a program

18   of testing, counseling and treatment for drug and alcohol abuse.

19   I'm also not going to impose a drug testing requirement.  You

20   also must abide by the special conditions of probation as set

21   forth in the local rules of this Court.

22   Now, I do believe that it is a just result, even though

23   there is no restitution involved, the -- it is a just result for

24   me to impose upon you a $5,000.00 fine.  That is the amount you

25   got from Mr. Steele, although I don't believe that he is a

victim, and the fine will be paid to the government and, if there

is -- if there really is a victim in this case, it is the

government and the agencies involved, and so I think that is a

just way to resolve the financial aspect of this case.

I -- so I will impose a $5,000.00 fine. It will be due

immediately. I will not impose interest. However -- I will

waive the interest. However, I will require that you pay that

fine within the first 30 months of your probation and, in

connection with the fine, I'm going to add a couple of additional

special conditions of probation.

One is that you will be prohibited from incurring new credit

charges or opening additional lines of credit without the

probation officer's approval unless you are in compliance with

this -- with -- well, I'll just leave it at that, unless -- there

won't be an "unless". You will need to get the probation

officer's approval before doing those things.

Also, I will require that you provide the probation officer

access to any requested financial information.

A mandatory special assessment has already been paid, as I

understand it, and you may be seated.

All right. Mr. Brown, I note that there is a significant

appeal waiver contained in your plea agreement. As qualified by

that waiver, you have the right to appeal the judgment of this

Court. Any Notice of Appeal must be filed with the Clerk not

more than 14 days from the date of the entry of the judgment

1       order.

2           If you desire counsel on appeal and you are not able to

3       retain counsel, the appropriate court will review a financial

4       affidavit filed by you to determine whether or not to appoint

5       counsel.

6           Do you understand your right to appeal and the 14-day filing

7       requirement?

8                   THE DEFENDANT:  Yes, sir.

9                   THE COURT:  All right.  I will place the Presentence

10      Report under seal subject to counsel's right to unseal as

11      necessary for appeal.

12          Any other matters we need to take up in this case?

13                  MR. CARRICO:  Yes, Your Honor.  We'd respectfully

14      request the Court to authorize Mr. Brown to continue working as

15      he is right now.  He has to receive authority from Probation to

16      continue to travel, staying in Evansville overnight, work in

17      Kentucky in the mornings, and then come back to West Virginia in

18      the -- on the weekends.

19                  THE COURT:  I will certainly permit that.

20                  MR. CARRICO:  Thank you, Your Honor.

21                  THE COURT:  And we will make sure that that's covered

22      in the conditions of probation.

23          Anything else?

24                  MR. RYAN:  No, Your Honor.

25                  MR. CARRICO:  No, sir.  Thank you.

1          THE COURT:  All right.  Thank you.

2      (Proceedings concluded at 12:10 p.m., January 21, 2014.)

3

4   CERTIFICATION:

5      I, Ayme A. Cochran, Official Court Reporter, certify that

6   the foregoing is a correct transcript from the record of

7   proceedings in the matter of United States of America, Plaintiff

8   v. Harold Brown, II, Defendant, Criminal Action No.

9   2:13-cr-00218, as reported on January 21, 2014.

10

11   s/Ayme A. Cochran, RMR, CRR                March 16, 2015

12   Ayme A. Cochran, RMR, CRR                        DATE

13

14

15

16

17

18

19

20

21

22

23

24

25