**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                   CRIMINAL ACTION NO. 2:14-cr-00118

GARY K. GRIFFITH,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are the Sentencing Guidelines determinations in this matter. For the reasons discussed herein, the Court finds that an enhancement pertaining to loss under U.S.S.G. § 2B1.1(b)(1) and the two-level enhancement for abuse of position of trust under U.S.S.G. § 3B1.3 are inapplicable in this case.

### *I.  Background*

This case arises out of a series of kickback schemes that centered primarily at the Mountain Laurel Mining Complex ("Mountain Laurel") in Logan County, West Virginia. Mountain Laurel is owned by Mingo Logan Coal Company, which, in turn, is a wholly-owned subsidiary of Arch Coal, Inc. ("Arch Coal"). (Mar. 9, 2015 Presentence Investigation Report ("PSR") ¶ 8.)

"Dating back to at least the early 2000s, [Defendant] served as a maintenance manager for an [Arch Coal] underground mine known as the Ben Creek mine, near the Logan and Mingo County Lines." (ECF 8, Ex. B at 1.) "At the time, as maintenance manager, [Defendant] was responsible for ordering repairs and replacement of heavy equipment, including shuttle cars." (*Id.*)

1

"Shuttle cars are primarily used for hauling debris created in the extraction of coal from the underground seam." (*Id.*)

North American Rebuild Company, Inc. ("NARCO") "is in the business of refurbishing and replacing shuttle cars." (*Id.*) "Once a shuttle car has reached its maximum useful life, coal companies like [Arch Coal] generally swap out the used shuttle car for one refurbished by NARCO, rather than purchase a new one." (*Id.*) "NARCO then takes the used shuttle car, strips down its parts and rebuilds the entire unit so it can be sold as refurbished." (*Id.*) "NARCO is owned by two individuals, one of [whom] . . . dealt directly with [Defendant] when it was time to order a refurbished shuttle car" (the "NARCO Contact"). (*Id.*)

"Since at least sometime around 2002, [David] Runyon served as the superintendent or general manager of [Arch Coal's] Ben Creek mine operation." (*Id.* at 2.) Defendant and Runyon together benefitted from a scheme whereby the NARCO Contact paid each of them for work relating to the shuttle cars (the "Scheme"). (*See id.*; *see also* PSR ¶ 60 (noting Defendant's statement that the NARCO Contact's brother also "paid [Defendant] on at least 10 occasions"). *See generally id.* ¶¶ 14–20, 33–34, 37–41, 49–56, 66–67 (describing additional schemes at Mountain Laurel that allegedly involved Defendant).) During the course of the Scheme, "[the NARCO Contact] paid . . . cash each to [Defendant] and Mr. Runyon for every shuttle car that was ordered for the Ben Creek mine operation." (ECF 8, Ex. B at 2. *See generally* PSR ¶ 31 (describing Stephen Herndon's statement that "Runyon used [Defendant] as a means to collect kickbacks").)

"Sometime in late 2005 or early 2006, [Arch Coal] shifted operations from Ben Creek to [Mountain Laurel] . . . ." (ECF 8, Ex. B at 2.) "Mr. Runyon was transferred" to Mountain Laurel "to serve as the general manager and [Defendant] was transferred to serve as the maintenance

manager." (*Id.*) "The [Scheme] continued at [Mountain Laurel]." (*Id.*; *see also* PSR ¶ 59 ("Prior to relocating from Ben Creek to Mountain Laurel sometime in 2006, [Defendant] was already receiving kickback payments for shuttle cars Mountain Laurel purchased from NARCO.").)

"Sometime around 2008, [Defendant] began suffering some health problems and eventually was placed on disability sometime around 2010." (ECF 8, Ex. B at 2.) The Government and Defendant "estimate that over the course of the [Scheme] . . . , [Defendant] and Mr. Runyon each received approximately $125,000, totaling approximately $250,000 in illegal cash kickbacks paid by [the NARCO Contact] on behalf of NARCO." (*Id.*; *see also* PSR ¶ 61 (describing Defendant's June 10, 2014 statement, in which he "acknowledged that he . . . and Runyon each received about $125,000, for a total of $250,000 is [sic] cash kickbacks for [the Scheme]").)

On March 31, 2014, special agents of the Internal Revenue Service ("IRS") "interviewed [Defendant] regarding his knowledge of allegations of any cash kickback payments made by any vendors at [Mountain Laurel]." (ECF 8, Ex. B at 2.) "[Defendant] falsely denied any knowledge or involvement and knew the statement was unlawful when made." (*Id.*; *see also* PSR ¶¶ 42–47 (describing Defendant's March 31, 2014 interview with special agents of the IRS).)

On May 30, 2014, the Government filed a single-count Information that charges Defendant with making a false, fictitious, or fraudulent statement or representation "in a matter within the jurisdiction of a department or agency of the United States" in violation of 18 U.S.C. § 1001(a)(2). (ECF 1 ¶ 7.) This charge relates to Defendant's statements to special agents of the IRS "[o]n or about March 31, 2014, at or near Beaver, Raleigh County, West Virginia." (*Id.*) The Information includes the following additional allegations regarding the Scheme:

> Since at least sometime in 2006, [Defendant], for himself and on behalf of David E. Runyon, received illegal cash kickbacks from [the NARCO Contact] amounting to

3

$6,000 to $10,000 for each new or refurbished shuttle car that was ordered for [Mountain Laurel] . . . .

Defendant . . . has accepted at least $250,000 in cash kickbacks from [the NARCO Contact].

(*Id.* ¶¶ 5 & 6.)

Defendant entered into a plea agreement with the Government, dated May 12, 2014, in which he agreed to plead guilty to the single-count Information. (ECF 8.) The plea agreement also states that Defendant "agrees that he owes restitution in the amount of $250,000 to Arch Coal." (*Id.* ¶ 5.) The plea agreement further provides that U.S.S.G. § 2B1.1 applies in this case and the following two enhancements are applicable: (1) a twelve-level enhancement for a loss more than $200,000, but less than $400,000; and (2) a two-level enhancement for abuse of position of trust. (*Id.* ¶ 11.) Defendant then pled guilty to the single-count Information during a plea hearing on July 14, 2014. (ECF 5.)

In the PSR, the probation officer recommends that the Court apply a twelve-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G) due to the "$250,000 in kickback payments" Defendant accepted "for his involvement in the [Scheme], half of which he subsequently paid to David Runyon." (PSR ¶ 77.) The PSR also includes a recommendation that the Court apply the two-level enhancement for abuse of position of trust under U.S.S.G. § 3B1.3 due to Defendant's role in the Scheme. (*Id.* ¶ 79.) Neither party submitted an objection to these two recommendations. (*See id.* at 29.)

The Court held a sentencing hearing in this case on March 10, 2015. (ECF 23.) During this hearing, the Court addressed its concerns regarding the attribution to Defendant of relevant conduct relating to the Scheme. (*See id.*) The Court then directed the parties to file briefing

4

addressing whether the loss and role enhancements arising out of the Scheme are applicable in this case. The Government filed its brief on March 17, 2015, (ECF 26), and Defendant filed his brief on April 1, 2015, (ECF 30). As such, these issues are fully briefed and ready for disposition.

## II. Legal Standard

Prior to the enactment of the Sentencing Reform Act of 1984 (the "SRA"), sentencing courts were permitted wide discretion in imposing criminal sentences within statutory minimums and maximums. *United States v. Pauley*, 511 F.3d 468, 471 (4th Cir. 2007) (citing *Mistretta v. United States*, 488 U.S. 361, 363 (1989)). However, the SRA created the Sentencing Commission "as an independent commission in the judicial branch of the United States" authorized to establish and implement Sentencing Guidelines for the federal judicial system. *Id.* (citing 28 U.S.C. § 991(a)).

The Supreme Court has "instructed district courts to read the United States Sentencing Guidelines as 'effectively advisory.'" *Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (quoting *United States v. Booker*, 543 U.S. 220, 245 (2005)). Nevertheless, the Supreme Court "stressed . . . that a sentencing court still must take the Guidelines into account at sentencing along with the factors set forth in § 3553(a)." *Pauley*, 511 F.3d at 472 (citing *Booker*, 543 U.S. at 264).

In *Gall v. United States*, the Supreme Court provided the following steps for a sentencing court: (1) calculate the Guidelines range; (2) give both parties an opportunity to argue for an "appropriate" sentence; (3) consider all factors listed in § 3553(a) to determine if they support a sentence requested by either party; and (4) adequately explain its reasons for choosing the sentence, including any justification for any variance. 552 U.S. 38, 49–50 (2007). The Court "may not presume that the Guidelines range is reasonable." *Id.* at 50 (citing *Rita v. United States*, 551

U.S. 338, 351 (2007)). Rather, the Court "must make an individualized assessment based on the facts presented." *Id.*; *United States v. Carter*, 564 F.3d 325, 330 (4th Cir. 2009) ("Regardless of whether the district court imposes an above, below, or within-Guidelines sentence, it must place on the record an 'individualized assessment' based on the particular facts of the case before it." (quoting *Gall*, 552 U.S. at 50–52)). "After settling on the appropriate sentence, [the Court] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50 (citing *Rita*, 551 U.S. 338).

### III.  Loss Enhancement under U.S.S.G. § 2B1.1(b)(1)

The first Guidelines determination before the Court is whether the loss associated with the Scheme is attributable to Defendant for purposes of applying a U.S.S.G. § 2B1.1(b)(1) enhancement. Section 2B1.1(b)(1) directs the Court to "increase the offense level" based on the loss associated with the offense "[i]f the loss exceeded $5,000." Section 2B1.1(b)(1) then provides incremental enhancements to the offense level based on the amount of the loss. "The government must prove the amount of loss by a preponderance of evidence." *United States v. Catone*, 769 F.3d 866, 876 (4th Cir. 2014) (citing *United States v. Pierce*, 409 F.3d 228, 234 (4th Cir. 2005)). The Court has "considerable flexibility" in determining the loss amount. *United States v. Seals*, 958 F.2d 369, at *3 (4th Cir. 1992).

The Government argues that the loss arising out of the Scheme is attributable to Defendant for purposes of applying a Section 2B1.1(b)(1) enhancement due to the relevant conduct provisions under Section 1B1.3(a)(1) through (3).[1] (ECF 26 at 3–7, 9–13.) Alternatively, the Government argues that the Information establishes the additional offense of conspiracy to

---

[1] The Government does not argue that the Scheme and its associated loss are relevant conduct under Section 1B1.3(a)(4), (*see* ECF 26), which provides that relevant conduct includes "any other information specified in the applicable guideline," U.S.S.G. § 1B1.3(a)(4).

commit honest services fraud, which triggers the cross-reference provisions under Sections 2B1.1(c)(3) and 2X1.1(c)(1) and ultimately results in the application of the Section 2B1.1(b)(1) enhancement.[2] (*Id.* at 13–15.) Defendant disagrees and argues that the loss arising out of the scheme is not attributable relevant conduct and the Section 2B1.1(c)(3) cross reference is inapplicable. (ECF 30.)

For the reasons discussed below, the Court finds that the Scheme and its associated loss are not attributable relevant conduct for Defendant and the Information does not establish an additional offense that triggers the Section 2B1.1(c)(3) cross-reference provision. As such, the Court finds that the loss arising out of the Scheme does not result in an enhancement under Section 2B1.1(b)(1).

## A.      Relevant Conduct Under U.S.S.G. § 1B1.3

The Government argues that the loss arising out of the Scheme is attributable to Defendant as relevant conduct under Section 1B1.3. (ECF 26 at 3–7, 9–13.) "Sentencing under the Sentencing Guidelines involves consideration of the *actual* conduct in which a defendant engaged, regardless of the charges for which he was indicted or convicted." *United States v. McVey*, 752 F.3d 606, 610 (4th Cir. 2014) (internal quotation marks and citations omitted); *cf.* U.S.S.G. § 1B1.3 cmt. n.1 ("The principles and limits of sentencing accountability under [the relevant conduct] guideline are not always the same as the principles and limits of criminal liability.").

---

[2] In its memorandum, the Government also discusses three cases in support of the following proposition: "Courts have applied the [U.S.S.G.] § 2B1.1 guideline in 18 U.S.C. § 1001 cases, and have attributed loss under that guideline." (ECF 26 at 7–9 (citing *United States v. Killen*, 761 F.3d 945 (8th Cir. 2014), *United States v. Atwood*, 348 F. App'x 827 (3d Cir. 2009), and *United States v. Bolla*, 346 F.3d 1148 (D.C. Cir. 2003)).) However, as Defendant correctly notes, "all three of [these] cited decisions involve disputes about the method used to calculate the loss amount, and not the propriety of applying a loss enhancement in the first place." (ECF 30); *see Killen*, 761 F.3d at 948–50 (addressing the district court's loss calculation, not whether a Section 2B1.1(b)(1) enhancement was applicable); *Atwood*, 348 F. App'x at 831–32 (same); *Bolla*, 346 F.3d at 1151–1154 (same). As such, these cases are not instructive as to the present issue of whether a Section 2B1.1(b)(1) enhancement is applicable in this case.

"Thus, despite the limited scope of conduct for which the defendant was convicted, he may nonetheless be sentenced more broadly for relevant conduct . . . ." *McVey*, 752 F.3d at 610. *But see United States v. White*, 77 F. App'x 678, 681 (4th Cir. 2003) ("[A]lthough relevant conduct for purposes of determining the offense level may be broader than the conduct supporting the offense of conviction, it may also be narrower."). "Conduct is part of the instant offense if it is relevant conduct under guideline section 1B1.3." *United States v. Smith*, 187 F. App'x 330, 332 (4th Cir. 2006) (citation omitted). "The Government bears the burden of proving relevant conduct by a preponderance of the evidence." *United States v. Monroe*, 156 F. App'x 543, 544 (4th Cir. 2005) (citing *United States v. Cook*, 76 F.3d 596, 604 (4th Cir. 1996)).

The Government argues that the Scheme and its associated loss are attributable to Defendant as relevant conduct under subsections (a)(1), (a)(2), and (a)(3) of U.S.S.G. § 1B1.3. The Court will address each subsection, in turn.

    1.    <u>U.S.S.G. § 1B1.3(a)(1)</u>

The United States first argues that the Scheme "occurred during the commission" of Defendant's "offense of conviction" and, as such, the loss arising out of this scheme is attributable to Defendant under U.S.S.G. § 1B1.3(a)(1). (ECF 26 at 3–7.) The Court disagrees.

Section 1B1.3(a)(1) provides that relevant conduct includes:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

The Court finds that the Scheme and its associated loss are not relevant conduct under Section 1B1.3(a)(1) due to the temporal restriction provided in this Section. Defendant's offense of conviction is making a false, fictitious, or fraudulent statement or representation "in a matter within the jurisdiction of a department or agency of the United States, that is, the Internal Revenue Service," "[o]n or about March 31, 2014" in violation of 18 U.S.C. § 1001(a)(2). (ECF 1 ¶ 7.) The Scheme—while at least part of the object of Defendant's false statement to IRS special agents—is not the offense of conviction. (*See id.*) Additionally, Defendant's involvement in the Scheme terminated roughly four years prior to the false statement that forms the basis for Defendant's offense of conviction. (*See, e.g.*, ECF 8, Ex. B at 2 (noting that Defendant developed health problems "and eventually was placed on disability sometime around 2010").) The Scheme therefore did not "occur[] during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1).

The Government does not argue that the Scheme and its associated loss satisfy Section 1B1.3(a)(1)'s temporal requirement if the offense of conviction is solely making a false, fictitious, or fraudulent statement or representation in violation of 18 U.S.C. § 1001(a)(2). (*See* ECF 26 at 3–7.) Rather, the Government contends that the Scheme, itself, forms part of the offense of conviction because "[t]he Information charges [that] . . . Defendant participated in [the Scheme] wherein he received approximately $250,000, then made a false statement by denying his receipt

9

of kickbacks." (*Id.* at 6.) Thus, the Government argues that the Scheme and its corresponding loss occurred during the commission of Defendant's offense of conviction. (*Id.* at 3–7.)

The Court is not persuaded by the Government's argument. The phrase "'offense of conviction' is not defined under the definitions section of the Guidelines." *United States v. Rebmann*, 321 F.3d 540, 543 (6th Cir. 2003); *see also* U.S.S.G. § 1B1.1 cmt. n.1. Nonetheless, numerous courts have analyzed the Guidelines, as a whole—including the definition of "offense of conviction" provided in Section 1B1.2(a)[3]—and the history of the Guidelines and determined that the phrase "'offense of conviction' describes only the precise conduct constituting the crime for which the defendant was convicted, and does not include non-offense relevant conduct." *Rebmann*, 321 F.3d at 543–44; *see, e.g.*, *United States v. Holbert*, 285 F.3d 1257, 1261 n.3 (10th Cir. 2002) ("The Sentencing Guidelines do not specifically define 'offense of conviction,' but indicate that the phrase encompasses only facts immediately related to the specific offense for which the defendant was convicted."); *United States v. Pressler*, 256 F.3d 144, 157 n.7 (3d Cir. 2001) (finding that the phrase "'offense of conviction' includes only the substantive crime for which a particular defendant was convicted").

The Court agrees with these decisions. A definition of "offense of conviction" that includes only the substantive crime charged ensures that defendants have notice of the precise nature of the

---

[3] As the Government notes, U.S.S.G. § 1B1.2(a) provides a definition of "offense of conviction" as "the offense conduct charged in the count of the indictment or information of which the defendant was convicted." (ECF 26 at 5.) However, as stated above, this definition does not appear in the definitions section of the Guidelines. *See* U.S.S.G. § 1B1.1 cmt. n.1. The commentary to Section 1B1.1 addresses definitions provided in other sections of the Guidelines and states:

> Definitions of terms also may appear in other sections. Such definitions are not designed for general applicability; therefore, their applicability to sections other than those expressly referenced must be determined on a case by case basis

*Id.* cmt. n.2. As such, the definition of "offense of conviction" in Section 1B1.2(a) is not controlling in determining the meaning of this phrase in the context of other sections of the Guidelines. *See id.*

10

charges provided in the indictment or information. *See, e.g.*, *United States v. Smith*, 44 F.3d 1259, 1263–64 (4th Cir. 1995) (stating the "basic principle[]" that an indictment "must contain allegations of each element of the offense charged, so that the defendant is given fair notice of the charge that he must defend" (citations omitted)); Fed. R. Crim. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."). Furthermore, this definition preserves "the compromise" made by the Sentencing Commission "between real offense sentencing and charged offense sentencing" that forms the foundation of the entirety of the Guidelines, *United States v. Fine*, 975 F.2d 596, 604 (9th Cir. 1992); *see* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1, 11–12 (1988) (discussing the compromise reached by the Sentencing Commission in balancing elements of charged-offense and real-offense systems), by ensuring that courts select the appropriate Chapter Two section based on the offense of conviction, then apply relevant conduct principles to reach a sentence based on a defendant's actual conduct, *see, e.g.*, U.S.S.G. § 1B1.1 (providing the application instructions for the Guidelines); *cf. United States v. Locklear*, 24 F.3d 641, 648 (4th Cir. 1994) ("To hold that the various guidelines of Chapter Two may apply regardless of whether the defendant has been convicted of the statutory provisions underlying those guidelines would effectively turn the Chapter Two guidelines into a series of specific offense characteristics, a result we do not believe the Sentencing Commission to have contemplated."); *United States v. Lambert*, 994 F.2d 1088, 1092 (4th Cir. 1993) ("Actual conduct remains relevant in the consideration of offense characteristics after a guideline has been chosen, in the consideration of various adjustments, and in the consideration of conduct-related departures, but the district court erred in permitting a

11

subjective assessment of the conduct's seriousness to affect its initial choice of guideline.").[4] The Court thus finds that the phrase "offense of conviction"—as used in the Guidelines outside of Section 1B1.2(a)—includes only the substantive crime for which a defendant was convicted.

As discussed above, the substantive crime to which Defendant pled guilty is making a false, fictitious, or fraudulent statement or representation within the jurisdiction of a department or agency of the United States "[o]n or about March 31, 2014" in violation of 18 U.S.C. § 1001(a)(2). (ECF 1 ¶ 7; *see also* ECF 26 at 9 ("Should the Court reject the United States' argument that the unlawful kickback scheme was part of the charged offense of conviction pursuant to [U.S.S.G.] §§ 1B1.2 and 1B1.3, the Court then limits the offense of conviction to the false statement itself.").) The Scheme (and the loss arising out of the Scheme) did not "occur[] during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). Accordingly, the Court finds that the Scheme and its associated loss are not attributable to Defendant as relevant conduct under U.S.S.G. § 1B1.3(a)(1).

    2.   U.S.S.G. § 1B1.3(a)(2)

The Government next argues that the Scheme and its associated loss were part of the same course of conduct or common scheme or plan as Defendant's offense of conviction and, as such, are attributable to Defendant as relevant conduct under Section 1B1.3(a)(2). (ECF 26 at 9–12.) The Court again disagrees.

---

[4] The Government's alternative approach—that the offense of conviction includes all allegations in the indictment or information, regardless of whether those allegations bear any relationship to the substantive offense—would nullify the balance between real-offense and charged-offense systems provided in the Guidelines and serve as an end-run-around relevant conduct principles. *Cf. United States v. Johnson*, 347 F.3d 635, 640 (7th Cir. 2003) ("[T]he Commission rejected a pure real offense system and, instead, selected a charge offense system with some elements of real offense sentencing. In short, where the Commission intended for judges to consider actual conduct instead of charged conduct, it made its intention clear within the guidelines." (citation omitted)). The Court declines the Government's invitation to follow an approach contrary to the principles underlying the Guidelines.

Section 1B1.3(a)(2) provides that relevant conduct includes the following:

> [S]olely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction . . . .

"As is obvious from its text, . . . [s]ubsection (a)(2) . . . encompasses a broader group of acts" than subsection (a)(1) due to the temporal restriction in the latter. *United States v. Horton*, 693 F.3d 463, 479 (4th Cir. 2012); *see also United States v. Johnson*, 347 F.3d 635, 640 (7th Cir. 2003) ("Subsection (a)(2) allows a court to consider a broader range of conduct than does the trailing clause of (a)(1)." (citation omitted)). "As a counterbalance to this broader scope, however, [s]ubsection (a)(2) has a threshold limitation on its applicability, *i.e.*, it is applicable 'solely with respect to offenses of a character for which [§ 3D1.2(d)] would require grouping of multiple counts.'" *Horton*, 693 F.3d at 479 (quoting U.S.S.G. § 1B1.3(a)(2)).

*Offenses of a Character for Which §3D1.2(d) Would Require Grouping*

"'Offenses of a character for which §3D1.2(d) would require grouping of multiple counts,' as used in subsection (a)(2), applies to offenses for which grouping of counts would be required under §3D1.2(d) had the defendant been convicted of multiple counts." U.S.S.G. § 1B1.3 cmt. n.3. "Subsection (a)(2) merely incorporates by reference the types of offenses set forth in §3D1.2(d)" and "[a]pplication of this provision does not require the defendant, in fact, to have been convicted of multiple counts." *Id.* However, "[s]ubsection (a)(2) . . . is applicable only when *both* the offense of conviction and the relevant conduct offense are capable of grouping." *Horton*, 693 F.3d at 479 (citing U.S.S.G. § 1B1.1 cmt. n.1(H)).

The record is lacking as to this grouping prerequisite of Section 1B1.3(a)(2). In particular, as Defendant notes, the Government "does not articulate what additional count, that is, what

charge . . . the [Scheme] would support."[5]  (ECF 30 at 8.) Furthermore, given this record, the Court

is not aware of which additional offense the Scheme would constitute. Absent a clear indication as

to the relevant additional offense, it is not apparent which section in Chapter Two would otherwise

be applicable to the additional offense and, correspondingly, whether that section would require

grouping with the offense of conviction under Section 3D1.2(d). *Cf.* U.S.S.G. § 1B1.3(a)(2)

(providing the grouping prerequisite). Without this showing, the Government has not met its

burden of showing that the Scheme constitutes an offense that satisfies the grouping prerequisite of

Section 1B1.3(a)(2). *See, e.g.*, *United States v. Monroe*, 156 F. App'x 543, 544 (4th Cir. 2005)

("The Government bears the burden of proving relevant conduct by a preponderance of the

evidence." (citing *United States v. Cook*, 76 F.3d 596, 604 (4th Cir. 1996))).

*Common Scheme or Plan or Same Course of Conduct*

　　　　Regardless of the deficiency as to the grouping prerequisite of Section 1B1.3(a)(2), the

Court finds that the Scheme and its associated loss are not relevant conduct under this Section

because they were not part of a common scheme or plan or the same course of conduct as the

offense of conviction. In addition to the grouping prerequisite, Section 1B1.3(a)(2) requires the

Government to "prove the necessary link between the convicted and unconvicted offenses" in one

of two ways, *United States v. Zehm*, 217 F.3d 506, 511 (7th Cir. 2000)—that the offenses were

---

[5] The Government argues in an unrelated discussion in its memorandum that "the conduct set forth in the information
could be considered to establish a kickback conspiracy, which would be in violation of 18 U.S.C. § 1346 (honest
services fraud)." (ECF 26 at 15.) The Court recently rejected pleas involving honest-services fraud in two related cases
due to factual-basis deficiencies. *See United States v. Evans*, 2015 WL 1808904, Criminal Action No. 2:14–cr–00113,
at *7 (S.D. W. Va. Apr. 21, 2015) (rejecting the defendant's plea); *United States v. Lusk*, 2015 WL 1808909, Criminal
Action No. 2:14–cr–00116, at *5 (S.D. W. Va. Apr. 21, 2015) (directing the parties to file additional briefing
regarding deficiencies in the factual basis for defendant's plea); *United States v. Lusk*, 2:14-cr-116 (S.D. W. Va. May
13, 2015) (rejecting the defendant's plea). The Government has not provided any information—and the record does
not otherwise reflect—that the deficiencies in the factual bases in the *Evans* and *Lusk* pleas are not similarly present in
this case. (*See, e.g.*, ECF 26.) Absent evidence that those deficiencies are not present here, the Scheme does not
implicate an honest services offense under 18 U.S.C. § 1346 for purposes of the Section 1B1.3(a)(2) analysis.

either part of a "common scheme or plan" or the "same course of conduct," U.S.S.G. § 1B1.3(a)(2). "While these two formulations sound similar, they actually capture two distinct concepts." *Zehm*, 217 F.3d at 511.

"For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*."[6] U.S.S.G. § 1B1.3 cmt. n.9(A). The Court finds that these factors are absent here. The victims are different between the offenses—the victims of the Scheme were private entities and (potentially) individuals, (*see* ECF 8, Ex. B at 1–2 (describing the Scheme)), while the victim of Defendant's March 31, 2014 false statement was the IRS, (*see, e.g.*, *id.* at 2 (noting that Defendant provided false statements to special agents of the IRS on March 31, 2014)). The two offenses also did not share the same accomplices, as the individuals who assisted Defendant in the Scheme did not participate in the offense of conviction. (*See id.* at 1–2.) Additionally, the two offenses lacked a common purpose—the purpose of the Scheme was to receive ill-begotten kickbacks, (*see id.* at 2 (noting the parties' "estimate that over the course of the [Scheme] . . . , [Defendant] and Mr. Runyon each received approximately $125,000, totaling approximately $250,000 in illegal cash kickbacks")), while the purpose of the false statement was to avoid negative consequences roughly four years

---

[6] Citing an unpublished Fifth Circuit case, the Government urges the Court to apply the following standard for the "scheme" or "plan" requirement of Section 1B1.3(a)(2): a scheme or plan "require[s] that the offenses were jointly planned or 'that the commission of one would entail the commission of another.'" (ECF 26 at 12 (quoting *United States v. McConnell*, 273 F. App'x 351, 355 (5th Cir. 2008)).) However, in *United States v. Hinojosa*, the Fifth Circuit rejected the application of this language as the appropriate standard under Section 1B1.3(a)(2). 484 F.3d 337, 341–42 (5th Cir. 2007). The *Hinojosa* court noted that "[s]uch findings would certainly support a conclusion that two offenses are part of a common scheme or plan, because joint planning and interdependence would likely also involve common victims, accomplices or purpose between the offenses." *Id.* at 342. However, the *Hinojosa* court found that the applicable standard is provided in the application notes to Section 1B1.3(a)(2). *Id.*

　　The Court will similarly rely on the language from the application notes to Section 1B1.3(a)(2) and any applicable precedent as the appropriate standards in the "common scheme or plan" analysis.

later, (*see* PSR ¶ 73 (providing the following statements from Defendant: "In my debriefing [on June 10, 2014] I admitted lying when I told IRS Criminal Investigator Eric Phillips that I knew nothing about any kickbacks at the Arch Coal mines where I had worked. I told them I didn't know what to say, and so I just lied.")). Finally, there is no commonality between the *modus operandi* Defendant utilized to commit the two offenses. (*See, e.g.*, ECF 8, Ex. B at 1–2 (describing the Scheme and Defendant's March 31, 2014 false statement to IRS special agents).) As such, the Scheme and the offense of conviction do not share a common scheme or plan. *See* U.S.S.G. § 1B1.3 cmt. n.9(A) (providing the factors courts should consider in the "common scheme or plan" analysis).

The Court also finds that the Scheme and the offense of conviction are not part of the same course of conduct. "Unlike 'common scheme or plan,' the concept of 'same course of conduct' does not require that acts be connected together by common participants or by an overall scheme." *United States v. Hodge*, 354 F.3d 305, 313 (4th Cir. 2004) (citation omitted). "Rather, it requires only that the defendant has engaged in an identifiable pattern of certain criminal activity." *Id.* (citation omitted). The Application Notes to Section 1B1.3 provide the following guidance regarding the "same course of conduct" analysis:

> Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant

16

consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

U.S.S.G. § 1B1.3 cmt. n.9(B); *see also Hodge*, 354 F.3d at 313 (noting that courts also consider "the nature of the defendant's acts, his role, and the number and frequency of repetitions of [his] acts" (quoting *United States v. Pauley*, 289 F.3d 254, 259 (4th Cir. 2002))). "Where the gap in time" between the offenses "is as long as . . . two years . . . '[the court] must be cautious and exacting in permitting such relatively stale dealings to be included in the same course of conduct as the offense of conviction.'" *United States v. Ruiz*, 178 F.3d 877, 882 (7th Cir. 1999) (quoting *United States v. Cedano-Rojas*, 999 F.2d 1175, 1180 (7th Cir. 1993)); *see also United States v. Dugger*, 485 F.3d 236, 242 (4th Cir. 2007) (finding that the time interval between offenses indicated the uncharged conduct was not part of the same course of conduct as the offense of conviction where "[m]ore than a year elapsed between" the defendant's offense of conviction for sale of drugs and his uncharged distribution conduct); *United States v. Mullins*, 971 F.2d 1138, 1144 (4th Cir. 1992) (finding that "[r]egularity and temporal proximity [were] extremely weak . . . , if present at all" where "the uncharged conduct took place over six months prior" to the acts "underlying the offense of conviction").

The factors provided in Application Note 9(B) to Section 1B1.3 indicate that the Scheme and the offense of conviction are not part of the same course of conduct. The offense of conviction occurred roughly four years after Defendant's involvement in the Scheme terminated. (*See* ECF 8, Ex. B at 2 (noting that Defendant "was placed on disability sometime around 2010" and he made the false statements to IRS special agents on March 31, 2014).) Additionally, there is no similarity between the two offenses—the Scheme involved Defendant using his position to receive illegal

17

kickbacks, while the offense of conviction was a false, fictitious, or fraudulent statement or representation to IRS special agents. (*See id.*) Finally, the offense of conviction did not occur repeatedly and was, instead, an isolated statement. (*See, e.g.*, PSR ¶¶ 42–47 (describing Defendant's March 31, 2014 interview with IRS special agents).) The Court therefore finds that the Scheme and its associated loss amount are not part of the same course of conduct as Defendant's offense of conviction. *See* U.S.S.G. § 1B1.3 cmt. n.9(B) (providing the factors courts should consider in the "same course of conduct" analysis).

As discussed above, the Court finds that the record is devoid of the necessary information to determine whether the Scheme constitutes an offense that would be grouped under Section 3D1.2(d) and is neither part of a "common scheme or plan" or the "same course of conduct" as the offense of conviction. Accordingly, the Court finds that the Scheme and the loss arising out of the Scheme are not attributable to Defendant as relevant conduct under U.S.S.G. § 1B1.3(a)(2).

    3.    <u>U.S.S.G. § 1B1.3(a)(3)</u>

The Government also argues that the loss arising out of the Scheme is relevant conduct under Section 1B1.3(a)(3) because "retaining his ill-gotten gains and hiding his and Runyon's role in the fraudulent scheme – the harm – was one of the objects of the [offense of conviction]." (ECF 26 at 13.) The Court disagrees because the Government's argument ignores the causation requirement of Section 1B1.3(a)(3).

Section 1B1.3(a)(3) provides that relevant conduct includes:

[A]ll harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions . . . .

The phrase "resulted from," as used in this Section, "establishes a causation requirement." *United States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000); *United States v. Yeaman*, 194 F.3d 442, 457

18

(3d Cir. 1999) ("Section 1B1.3(a)(3) establishes a causation requirement when determining actual loss."). Under this requirement, the defendant's "relevant conduct must be . . . [the] cause of a harm for that harm to be considered in assigning the guideline range." *United States v. Ramos-Delgado*, 763 F.3d 398, 401 (5th Cir. 2014); *see, e.g.*, *id.* (finding that Section 1B1.3(a)(3) requires "but-for" causation); *United States v. Cruz-Gramajo*, 570 F.3d 1162, 1171 n.9 (9th Cir. 2009) ("[T]he harm considered relevant for purposes of § 1B1.3(a)(3) is limited to harm that was a 'direct result or flowed naturally from the defendant's criminal misconduct.'" (quoting *United States v. Stoterau*, 524 F.3d 988, 998 (9th Cir. 2008))); *United States v. Fox*, 999 F.2d 483, 486 (10th Cir. 1993) (finding that harm was attributable relevant conduct under Section 1B1.3(a)(3) where it "was a direct result" and "flowed naturally" from the acts "that the defendant aided and abetted"). *See generally United States v. Molina*, 106 F.3d 1118, 1124 (2d Cir. 1997) ("The few decisions that have commented upon subsection 1B1.3(a)(3) have interpreted its 'resulted from' language to require a showing that the harm to be attributed to the defendant was 'caused' by the defendant's criminal conduct." (citations omitted)).

The loss presently at issue was not caused by the offense of conviction—making a false, fictitious, or fraudulent statement or representation in a matter within the jurisdiction of a department or agency of the United States "[o]n or about March 31, 2014." (*See, e.g.*, ECF 1 ¶ 7 (constituting the offense of conviction).) Rather, it "resulted from" the Scheme. (*See, e.g.*, ECF 8, Ex. B at 1–2 (describing the Scheme and its associated loss).) As discussed above, the Scheme is not relevant conduct under either Section 1B1.3(a)(1) or (a)(2). As the Scheme is not relevant conduct, the harm that resulted from the Scheme—the loss—is similarly not relevant conduct under Section 1B1.3(a)(3). *See, e.g.*, *Ramos-Delgado*, 763 F.3d at 401; *cf. Molina*, 106 F.3d at

19

1124 (finding that the defendant was "liable for the co-conspirators' [acts] under subsection 1B1.3(a)(1)(B), and for all harm resulting from those acts under subsection 1B1.3(a)(3)").

Accordingly, the Court finds that the loss arising out of the Scheme is not attributable to Defendant as relevant conduct under Section 1B1.3(a)(3). In summary, the Court finds that the Scheme and its associated loss are not attributable to Defendant as relevant conduct under any provision of Section 1B1.3(a).[7]

**B.      The Cross Reference under U.S.S.G. § 2B1.1(c)(3)**

The Government's final argument is that the Court should "use the cross reference provided in U.S.S.G. § 2B1.1(c)(3) to apply the loss calculations in § 2B1.1." (ECF 26 at 13.) The Court also finds this argument unavailing.

Section 2B1.1(c)(3) "provides a cross reference to another guideline in Chapter Two (Offense Conduct) in cases in which the defendant is convicted of a general fraud statute, and the count of conviction establishes an offense involving fraudulent conduct that is more aptly covered by another guideline." U.S.S.G. § 2B1.1 cmt. n.16. "As the Guidelines note, however, because § 1001(a)(2) prohibits the making of *any* false statement within the jurisdiction of the government, a defendant's conduct will often be 'more aptly covered by another guideline.'" *United States v. Arturo Garcia*, 590 F.3d 308, 313 (5th Cir. 2009) (citation omitted). "For this reason, Section 2B1.1(c)(3) sets out three criteria for determining whether another, more specific cross-reference provision should be used for sentencing the defendant on the offense of conviction . . . ." *Id.* Section 2B1.1(c)(3) provides these criteria as follows:

---

[7] The Court informally consulted with the United States Sentencing Commission on the issue of the attribution of relevant conduct based on the Scheme. The Sentencing Commission concurred with the Court's conclusion, as provided herein.

If (A) neither subdivision (1) nor (2) of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (e.g., 18 U.S.C. § 1001 . . . ); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

Subdivision (A) of Section 2B1.1(c)(3) is satisfied here, as neither subdivision (1) (pertaining to firearm, destructive devise, explosive material, and controlled substances offenses) nor subdivision (2) (regarding arson and property damage by explosive offenses) apply in this case. Additionally, subdivision (B) is also satisfied, as the offense of conviction is making a false, fictitious, or fraudulent statement or representation in violation of 18 U.S.C. § 1001(a)(2). (*See* ECF 1 ¶ 7.) As such, only subdivision (C) is at issue.

The Government argues that the Information "establishes" the additional offense of conspiracy to commit honest services fraud. (ECF 26 at 15.) Under the Government's proffered approach, the Court should then use the cross reference in Section 2B1.1(c)(3), apply the corresponding Guideline for conspiracy under Section 2X1.1, and use the cross reference under Section 2X1.1(c)(1) to return to Section 2B1.1. (*Id.*) However, once the analysis returns to Section 2B1.1, the Government contends that the offense under consideration would be conspiracy arising out of the Scheme and the loss associated with the Scheme would then be applicable under Section 2B1.1(b)(1). (*Id.*)

The Government's argument hinges on the Information establishing the offense of conspiracy to commit honest services fraud, thereby triggering the cross reference provision under Section 2B1.1(c)(3). (*See id.* at 14.) The Government argues that, to "establish[] an offense specifically covered by another guideline," U.S.S.G. § 2B1.1(c)(3)(C), "[t]he charging language need not specifically list out each element of the related offense," (ECF 26 at 14).

21

The Fourth Circuit has not expressly addressed whether the count of conviction must establish each element of another offense to trigger the cross reference in Section 2B1.1(c)(3).[8] The Court also has not located a decision from another district court in the Fourth Circuit analyzing this issue. However, the majority of courts to interpret the phrase "establishes an offense specifically covered by another guideline" in Section 2B1.1(c)(3) found that this language means that a court should only apply the Section 2B1.1(c)(3) cross reference if the count of conviction establishes the elements of an additional offense. *United States v. Ralph*, No. 08–40051–01–SAC, 2008 WL 4911151, at *2 (D. Kan. Nov. 13, 2008) (citations omitted); *see, e.g.*, *Arturo Garcia*, 590 F.3d at 315–16 ("Adopting the reasoning of . . . other circuits . . . [and] hold[ing] that a district court may only apply [the] cross-reference provision under U.S.S.G. § 2B1.1(c)(3) if the facts alleged in the count of conviction support the application of that provision."); *United States v. Bah*, 439 F.3d 423, 427 (8th Cir. 2006) ( "[The Section 2B1.1(c)(3)] cross-reference is applicable 'only if the conduct alleged in the count of the indictment of which the defendant is convicted establishes the elements of another offense.'" (quoting *United States v. Genao*, 343 F.3d 578, 583 (2d Cir. 2003))); *United States v. Kim*, 95 F. App'x 857, 862 (9th Cir. 2004) ("[U]nder the terms of the [Section 2B1.1(c)(3)] cross-reference provision, the statutory [mens rea] element had to be established by the allegations of the indictment."); *Genao*, 343 F.3d at 584 ("[W]e hold that §

---

[8] The Government cites an unpublished opinion by the Fourth Circuit in support of its argument that "[t]he charging language need not specifically list out each element of the related offense for the cross reference to apply." (*See* ECF 26 at 14 (citing *United States v. Bryant*, 93 F. App'x 573, 574–75 (4th Cir. 2004)).) However, *Bryant* is a two-page opinion, in which the court never expressly addressed whether the Section 2B1.1(c)(3) cross reference requires the count of conviction to establish each element of an additional offense. *See Bryant*, 93 F. App'x at 574–75. The Court therefore does not interpret *Bryant* as the Fourth Circuit's current position on this issue. *See, e.g.*, *Gita Sports Ltd. v. SG Sensortechnik GmbH & Co. KG*, 560 F. Supp. 2d 432, 437 (W.D.N.C. 2008) (noting that "an unpublished opinion . . . is not binding on [the] [c]ourt, but it would be highly persuasive if the [c]ourt believed that it represented the Fourth Circuit's current position on this issue"). Further, *Bryant* is an unpublished opinion and, as such, is not controlling authority. *See, e.g.*, *McKinney v. K-Mart Corp.*, 649 F. Supp. 1217, 1219 n.4 (S.D. W. Va. 1986) (stating that "an unpublished opinion" from the Fourth Circuit is "persuasive authority at most"). The Court thus finds that the *Bryant* opinion is neither controlling nor persuasive authority as to the present issue.

22

2B1.1(c)(3) is applicable only if the elements of another offense are established by conduct set forth in the count of conviction (and proven by at least a preponderance of the evidence).”); *Ralph*, 2008 WL 4911151, at *2–3 (finding that the count of conviction must establish the elements of the additional offense in order for a court to apply the Section 2B1.1(c)(3) cross-reference provision); *United States v. Rodriguez*, 493 F. Supp. 2d 833, 834–36 (W.D. Tex. 2007) (same). *But see United States v. Ochoa*, 291 F. App'x 265, 268 (11th Cir. 2008) (finding that the district court's application of the Section 2B1.1(c)(3) cross reference when the count of conviction did not establish all elements of the additional offense was not plain error because there was “no controlling precedent from the Supreme Court” or the Eleventh Circuit “establish[ing] that the district court plainly erred by applying the cross reference”).

The Court is persuaded by this majority position for numerous reasons. First, the plain meaning of Section 2B1.1(c)(3) indicates that the count of conviction must establish all elements of the additional offense. *See generally United States v. Hargrove*, 478 F.3d 195, 205 (4th Cir. 2007) (Wilkins, C.J., concurring in part and dissenting in part) (“In interpreting a guideline, ordinary rules of statutory construction apply.” (citing *United States v. Stokes*, 347 F.3d 103, 105 (4th Cir. 2003))). The Guidelines do not define the term “establishes.” *See* U.S.S.G. § 1B1.1, cmt. n.1. However, common definitions of “establish” are instructive here. *Black's Law Dictionary* defines the term “establish,” in relevant part, as “[t]o settle, make, or fix firmly.” *Black's Law Dictionary* (10th ed. 2014). Definitions of “establish” provided in *Webster's Third New International Dictionary* are similar: “to make firm or stable[;] fix to prevent or check unsteadiness, wavering, turmoil, or agitation” and “to calculate or determine exactly and with certainty the terms, limits, or identity of.” *Webster's Third New International Dictionary* 778

(Philip Babcock Gove ed., Merriam-Webster Inc. 2002). Applying these definitions to the present issue, a count of conviction only "fix[es] firmly" or "determine[s] exactly and with certainty the terms, limits, or identity" of a particular offense if it provides all of the elements of that offense. Any lesser requirement would allow uncertainty as to contours of the additional offense and correspondingly be contrary to the inclusion of the word "establishes" in Section 2B1.1(c)(3). *See, e.g.*, *Bah*, 439 F.3d at 427 (finding that a "plain reading of [the] unambiguous language" in Section 2B1.1(c)(3) provides that this cross reference is only applicable if the count of conviction establishes the elements of an additional offense). The Court therefore "give[s] [the] guideline its plain meaning, as determined by examination of its language," *United States v. Strieper*, 666 F.3d 288, 294 (4th Cir. 2012) (quoting *Hargrove*, 478 F.3d at 205), and finds that the plain meaning of the phrase "establishes an offense specifically covered by another guideline," as used in Section 2B1.1(c)(3), requires that the count of conviction establish all elements of the additional offense, *see, e.g.*, *Ralph*, 2008 WL 4911151, at *2 (stating that "[m]ost courts read and apply [the Section 2B1.1(c)(3)(C)] requirement in the same plain and unambiguous manner"—as requiring that the count of conviction establish the elements of another offense (citations omitted)).

Second, the history of Section 2B1.1(c)(3) supports this interpretation of the Guideline. In *Genao*, the Second Circuit provided the following useful discussion regarding the history of Section 2B1.1(c)(3):

> § 2B1.1 replaces a previous Guideline, U.S.S.G. § 2F1.1, that contained substantially broader language: The prior guideline provided for cross-reference whenever "the indictment or information setting forth the count of conviction (or a stipulation described in § 1B1.2(a)) establishes an offense *more aptly covered* by another guideline." U.S.S.G. § 2F1.1 (deleted), cmt., n. 14 (1998) (emphasis added). . . . [T]he Sentencing Commission replaced the prior cross-reference provision with § 2B1.1(c)(3), and, in doing so, limited its applicability to situations in which the conduct set forth in the count of conviction establishes an offense

24

"specifically covered" by another guideline. This change limits the applicability of the cross-reference provision to situations in which the conduct set forth in the relevant count of the indictment actually constitutes an offense covered by another guideline.

343 F.3d at 583–84; *see also Bah*, 439 F.3d at 427 n.3 (also finding that, by changing the operative language when consolidating § 2F1.1 and § 2B1.1, "the Sentencing Commission intended to limit the application of the cross-reference to situations in which the conduct set forth solely in the count of conviction establishes another offense"). The Court similarly finds that the Sentencing Commission's amendment of Section 2B1.1(c)(3) to more restrictive language requiring that the count of conviction establish an offense *specifically covered* by another Guideline—rather than "more aptly covered"—supports the plain reading that this cross reference is only applicable if the count of conviction establishes the elements of an additional offense. *Cf.* U.S.S.G. app. A (providing that each statutory offense corresponds to a particular Chapter Two Guideline).

Third, the Court's interpretation of Section 2B1.1(c)(3) is in accordance with the purpose of the Guidelines. *See, e.g.*, *Stokes*, 347 F.3d at 105 (stating that "ordinary rules of statutory construction . . . require us to give the guideline its plain meaning, as determined by examination of its 'language, structure, and purpose'" (quoting *United States v. Horton*, 321 F.3d 476, 479 (4th Cir. 2003))); *cf. United States v. Stewart*, 49 F.3d 121, 123 n.3 (4th Cir. 1995) ("[W]e should try to ascertain a sound interpretation of the Guidelines and its goals."). "The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice." *Koon v. United States*, 518 U.S. 81, 113 (1996). "In this respect, the Guidelines provide uniformity, predictability, and a degree of detachment lacking in our earlier system." *Id.*

An interpretation of Section 2B1.1(c)(3) that requires the count of conviction to establish the elements of the additional offense is a standard that courts can uniformly apply in sentencings. In contrast, the Government's proffered alternative—applying the Section 2B1.1(c)(3) cross-reference if the charging language implicates another offense, but does not establish the elements of that offense, (*see* ECF 26 at 13–15)—fails to provide a firm standard courts can follow when applying this Section. Indeed, this lesser requirement would likely result in courts throughout the country applying different standards as to the level of information a count of conviction must provide to trigger the Section 2B1.1(c)(3) cross reference. *Cf.* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 Am. Crim. L. Rev. 19, 23 n.17 (2003) (stating that when sentencing "mechanisms" were "not used uniformly, they . . . very likely result[ed] in the re-emergence of disparity from region to region"). The Court declines to interpret Section 2B1.1(c)(3) in a manner that promotes the application of differing standards by district courts during sentencings. *See, e.g.*, U.S.S.G. ch. 1, pt. A, introductory cmt. 1(3) (stating that Congress's three basic objectives in enacting the Sentencing Reform Act of 1984 were "honesty," "reasonable uniformity," and "proportionality" in sentencing); *United States v. Turner*, 59 F.3d 481, 488 (4th Cir. 1995) (rejecting an interpretation of a Guideline that "would contradict two of the fundamental purposes of the Guidelines: uniformity and proportionality in sentencing" (citations omitted)); *cf. Exxon Shipping Co. v. Baker*, 554 U.S. 471, 499 (2008) ("Courts of law are concerned with fairness as consistency . . . .").

Finally, the Court supports the majority position for a pragmatic reason. Interpreting Section 2B1.1(c)(3) as requiring the establishment of all elements of an additional offense is the

26

only approach that promotes certainty in a court's application of the Guidelines. *Cf.* 28 U.S.C. § 991(b)(1) (stating that one purpose of the Sentencing Commission is to "establish sentencing policies and practices for the Federal criminal justice system that . . . provide certainty and fairness in meeting the purposes of sentencing"). Any lesser requirement creates ambiguities in sentencing decisions and forces challenging questions without clear answers, such as (1) if not all, then how many elements of the additional offense does the count of conviction have to establish to trigger the Section 2B1.1(c)(3) cross reference?; (2) are some elements more important than others?; and (3) should a court apply this cross reference if the record reflects that some elements of the additional offense are not satisfied? The Court will not interpret the Guidelines in a manner that injects such uncertainty into sentencing decisions. *See, e.g.*, *Exxon Shipping Co.*, 554 U.S. at 504 ("[A] penalty should be reasonably predictable in its severity, so that even Justice Holmes's 'bad man' can look ahead with some ability to know what the stakes are in choosing one course of action or another." (citing O.W. Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 459 (1897))); *cf. Apprendi v. New Jersey*, 530 U.S. 466, 557 (2000) ("The Guidelines note that 'a sentencing system tailored to fit every conceivable wrinkle of each case can become unworkable and seriously compromise the certainty of punishment and its deterrent effect.'" (quoting U.S.S.G. ch. 1, pt. A, introductory cmt. 1(2))).

For these reasons, the Court holds that the cross reference in Section 2B1.1(c)(3) is only applicable if the count of conviction establishes the elements of an additional offense. In this case, the Information fails to establish all of the elements for the additional offense of conspiracy to commit honest services fraud, such as whether the Scheme involved the use of the mails or wires.[9]

---

[9] One element of conspiracy under 18 U.S.C. § 371 is "an agreement between two or more persons to act together in committing an offense." *United States v. Chorman*, 910 F.2d 102, 109 (4th Cir. 1990). The Government asserts that

27

(*See, e.g.*, ECF 1 (the Information); ECF 26 at 15.). As the Information does not establish all of the elements of this additional offense, the Court finds that the cross reference under Section 2B1.1(c)(3) is inapplicable.

### IV.  *The Abuse of Position of Trust Enhancement under U.S.S.G. § 3B1.3*

The final Guideline issue before the Court is the applicability of the two-level enhancement for abuse of position of trust under U.S.S.G. § 3B1.3.[10] The Court finds that the above relevant conduct discussion is dispositive as to the Section 3B1.3 enhancement.

U.S.S.G. § 3B1.3 provides the following, in relevant part:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

The purpose of Section 3B1.3 is to "penalize[] defendants who take advantage of a position that provides them with the 'freedom to commit a difficult-to-detect wrong.'" *United States v. Bollin*, 264 F.3d 391, 415 (4th Cir. 2001) (quoting *United States v. Moore*, 29 F.3d 175, 179 (4th Cir. 1994)). The Fourth Circuit has "rejected a mechanistic approach to the abuse of trust enhancement that excludes defendants from consideration based on their job titles." *United States v. Akinkoye*, 185 F.3d 192, 203 (4th Cir. 1999) (citing *United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995)). "Instead, [the court's] inquiry consists of 'an individualized determination of each

---

the object of the conspiracy would be honest services mail or wire fraud, but acknowledges that "the Information does not specify whether wire fraud or mail fraud was an object of the conspiracy." (ECF 26 at 15.) *See generally United States v. Vinyard*, 266 F.3d 320, 326 (4th Cir. 2001) ("[T]he elements of mail fraud are '(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purposes of executing the scheme.'" (quoting *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1404 (4th Cir. 1993))); *United States v. Allen*, 491 F.3d 178, 185 (4th Cir. 2007) ("Wire fraud under 18 U.S.C. § 1343 has 'two essential elements: (1) the existence of a scheme to defraud and (2) the use of . . . wire communication in furtherance of that scheme.'" (quoting *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006))).

[10]  During the March 10, 2015 hearing in this matter, the Court invited the parties to also brief the applicability of the two-level enhancement for abuse of position of trust under U.S.S.G. § 3B1.3. The parties declined to brief this issue. (*See* ECF 26 & 30.)

defendant's culpability.'" *United States v. Brack*, 651 F.3d 388, 393 (4th Cir. 2011) (quoting *United States v. Moore*, 29 F.3d 175, 179 (4th Cir. 1994)). "In assessing individual culpability under § 3B1.3, [the court] adopt[s] 'the perspective of the victim,' not that of the defendant." *Id.* (quoting *United States v. Abdelshafi*, 592 F.3d 602, 611 (4th Cir. 2010)).

There are two requirements for the abuse-of-trust enhancement "to apply to a given defendant": (1) "the defendant must occupy and 'abuse[] a position of public or private trust,'" *id.* (quoting U.S.S.G. § 3B1.3); and (2) "the defendant's abuse of trust must 'significantly facilitate[] the commission or concealment of the offense.'" *Id.* As to the first requirement, the Application Notes to Section 3B1.3 provide the following pertinent discussion regarding the definition of "public or private trust":

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

U.S.S.G. § 3B1.3 cmt. n.1. Additionally, "[i]f the nature of the defendant's position is in doubt, three primary factors inform our inquiry as to whether the defendant held a position of trust: (1) whether the defendant had special duties or access to information not available to other employees, (2) the extent of the defendant's discretion, and (3) whether the defendant's acts indicate she is more capable than similarly situated criminal actors." *Brack*, 651 F.3d at 393 (citing *Akinkoye*, 185 F.3d at 203).

In the PSR, the probation officer recommends that the Court apply the two-level Section 3B1.3 enhancement solely due to Defendant's positions at the Ben Creek mine operation and Mountain Laurel during the Scheme. (*See* PSR ¶ 79.) However, as discussed at length above, the

29

Court finds that the Scheme is not relevant conduct attributable to Defendant. As such, the Scheme cannot be the basis for applying the Section 3B1.3 enhancement.

The PSR does not provide that Defendant was in a similar position of authority during the offense of conviction—making a false, fictitious, or fraudulent statement or representation in a matter within the jurisdiction of a department or agency of the United States on or about March 31, 2014. (*See, e.g.*, PSR ¶¶ 42–47 (describing Defendant's offense of conviction).) The Court also finds no evidence in the record that Defendant was in a position of "public or private trust" when he committed the offense of conviction. The Court therefore finds that Defendant was not in a position of "public or private trust" at the time of the offense of conviction.

Accordingly, the Court finds that the two-level enhancement for abuse of a position of trust under Section 3B1.3 is inapplicable in this case. *See, e.g.*, *Brack*, 651 F.3d at 393 (stating that a defendant must "occupy and abuse a position of public or private trust" for a court to apply the Section 3B1.3 enhancement (internal quotation marks and citation omitted)).

## *V.  Conclusion*

For the reasons discussed above, the Court **FINDS** that the Scheme and its associated loss are not relevant conduct attributable to Defendant under U.S.S.G. § 1B1.3(a). Additionally, the Court **FINDS** that the cross reference under Section 2B1.1(c)(3) is inapplicable in this case. As such, the Court **FINDS** that the loss arising out of the Scheme is not attributable to Defendant for purposes of applying an enhancement under U.S.S.G. § 2B1.1(b)(1). Finally, the Court **FINDS** that the two-level abuse of position of trust enhancement under U.S.S.G. § 3B1.3 is also inapplicable in this matter.

The Court **DIRECTS** the probation officer to file an addendum to the PSR reflecting the Court's findings in this Memorandum Opinion and Order.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        June 24, 2015

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE